313 Ga. 667
FINAL COPY

S22A0265.  EARLY v. THE STATE.

NAHMIAS, Chief Justice.

Appellant Darrall Early was convicted of felony murder and aggravated assault in connection with the shooting death of Ramonte Harris. In this appeal, he contends that the trial court erred by admitting a jail video recording into evidence and by failing to merge the aggravated assault count when sentencing him. Seeing no merit in these contentions, we affirm.[1]

---

[1] Harris was killed on February 2, 2019. In August 2019, an Athens-Clarke County grand jury indicted Appellant for malice murder, felony murder predicated on aggravated assault, felony murder predicated on possession of a firearm by a first-offender probationer, aggravated assault with a deadly weapon, possession of a firearm by a first-offender probationer, and possession of a firearm during the commission of a felony. At a trial from March 2 to 6, 2020, the jury found Appellant not guilty of malice murder and possession of a firearm during the commission of a felony, but guilty of voluntary manslaughter as a lesser offense of felony murder predicated on aggravated assault, felony murder predicated on possession of a firearm by a first-offender probationer, aggravated assault, and possession of a firearm by a first-offender probationer. The trial court sentenced Appellant to serve life in prison for felony murder predicated on possession of a firearm by a first-offender probationer and 20 concurrent years for aggravated assault. The voluntary manslaughter verdict was vacated as a matter of law, see *Griggs v. State*, 304 Ga. 806, 807-809 (822 SE2d 246) (2018), and the count of possession of a firearm by a first-offender probationer merged. Appellant filed a timely motion

1. The evidence presented at Appellant's trial showed the following. Shortly before 5:00 p.m. on February 2, 2019, Harris's girlfriend, Jodi Gibbons, drove him to an apartment complex in Athens so he could buy some cocaine. Gibbons testified as follows. She dropped off Harris outside building D of the apartment complex and waited in her car while Harris went inside apartment D-5, where he, Appellant (who was his best friend), and others who lived in the area often hung out. About five minutes later, Harris came outside onto the walkway in front of apartment D-5 with Appellant following behind him. Harris said something like "so you're going to shoot me." Appellant then shot Harris, and Harris said, "damn bro, you're going to shoot me." Harris tried to walk down the stairs directly in front of apartment D-5 but began to collapse. Gibbons did not see Harris hit Appellant, nor did she see Harris with a weapon.

Another witness, who was in her car in the parking lot, saw

for new trial, which he later amended. Following a hearing, the trial court denied the motion on September 2, 2021. Appellant then filed a timely notice of appeal directed to the Court of Appeals, which transferred the case to this Court. The case was docketed to the term of this Court beginning in December 2021 and submitted for a decision on the briefs.

Harris and Appellant on the walkway "having a normal conversation like they always d[id]." She did not hear any arguing, and she did not see Harris hit Appellant. She heard a "pop" and saw Harris begin to collapse as Appellant ran away. A third witness, who was standing outside near building D, heard a gunshot, saw Harris at the top of the stairs, and heard him say "you shot me" and "someone call the ambulance." The witness testified that after the shooting, he saw Appellant running. Finally, a witness who was sleeping inside apartment D-5 was awoken by the sound of arguing. He heard Harris say "you ain't going to do s**t to me" and "not going to shoot me." He then heard a gunshot and ran outside the apartment, where he saw Harris bleeding and holding his chest near the staircase.

Harris was taken to a hospital, where he died later that evening. A medical examiner concluded that Harris's cause of death was a gunshot wound to the right side of the chest. The bullet traveled front to back and downward, coming to rest in Harris's

back.[2]

Within an hour after the shooting, investigators received information that Appellant had fled the apartment complex in a white pickup truck with black racing stripes and chrome rims. When an officer saw a truck matching that description and initiated a traffic stop, the truck slowed down, the passenger door opened, and Appellant fled on foot as the truck sped away. He ran down a road behind a shopping plaza, but officers eventually apprehended him.

At the police station, an investigator took photographs of Appellant, which showed a small abrasion on his lip. The investigator did not see any serious injuries on Appellant. Later that night, Appellant was interviewed by a detective, and the recorded interview was played for the jury. Initially, Appellant denied shooting Harris. Appellant then claimed that he saw a man named "Fredo" shoot Harris and flee carrying a gun.

When the detective confronted Appellant, he hung his head,

---

[2] No evidence was admitted regarding the type of bullet recovered from Harris's body.

began to cry, and said "I'm sorry." Appellant claimed that Harris had been using heroin just before the shooting, Appellant told Harris to stop using heroin, and they argued; after Harris became angry and punched Appellant in the face two times, Appellant shot Harris. In a written statement, Appellant added that the shooting took place inside the apartment. He claimed that after Harris hit him twice in the face, he "fe[l]l down by the couch[,] pulled out [his] gun[,] and shot one time." Appellant also claimed that he hid the gun in a sewage drain near the apartment complex.

Later during the interview, Appellant said that the drugs Harris used "d[id] something to him" and Appellant had never seen that side of him. Appellant claimed that he was "terrified." Appellant added that as he grabbed his gun, which was on his hip, Harris grabbed the top of the weapon; Appellant then "blacked out," and he did not know the gun was in his hand until he went outside.

After the interview, officers searched the location where Appellant claimed he hid the gun, but the gun was never recovered. During a search of the crime scene shortly after the shooting,

5

investigators found a .40-caliber shell casing under the stairs below apartment D-5 and blood on the walkway near the apartment. Appellant was on probation as a felony first offender at the time of the shooting.

At trial, the State also presented a jail deputy sheriff's body-camera recording, which showed Appellant in jail about six months after his arrest for the charged crimes. At one point during the video, Appellant said, "I'm a murderer." Appellant did not testify. His counsel argued that Appellant shot Harris in self-defense or the shooting amounted only to voluntary manslaughter.

2. Appellant claims that the trial court abused its discretion and violated his constitutional rights by admitting the jail deputy's body-camera recording into evidence. This claim lacks merit.

(a) Before trial, Appellant's counsel filed a "Motion in Limine to Exclude Testimony and Video from Jail," arguing, among other things, that the evidence was unfairly prejudicial in violation of OCGA § 24-4-403 ("Rule 403"), and showed only his bad character in violation of OCGA § 24-4-404 (b) ("Rule 404 (b)"). At a hearing on the

motion, Appellant's counsel played the body-camera video for the trial court. The video was about two minutes long and in the lower right corner had a date stamp of August 7, 2019 (about six months after Appellant's arrest for the charged crimes). The video showed Appellant, who was wearing an orange jail jumpsuit, being handcuffed by the deputy in a common area of the jail, while several other deputy sheriffs stood nearby. The deputy then led Appellant and another inmate to a small cell on the opposite side of the common area and removed the handcuffs from Appellant's wrists. Appellant and the deputy spoke for a few moments, and as the other inmate entered the cell and the deputy removed his handcuffs, Appellant said "I'm a murderer" and cursed. Both men then argued with the deputy for a few moments. The video ended with another deputy closing the cell door.

Appellant's counsel argued that the trial court should exclude the body-camera video and testimony about the incident because it was highly prejudicial, as the video showed Appellant in handcuffs and a jumpsuit in jail after his arrest, being disciplined for a matter

7

unrelated to this case. Counsel asserted, "He's being put into what we would call the hole. It's . . . lockdown . . . [in] a very small room with another man . . . for an unrelated matter," and that Appellant was "expressing . . . frustration [about] being put into the hole." Counsel also argued that the evidence "could even be characterized as extrinsic acts" that showed Appellant's bad character. The prosecutor responded that the deputy who would authenticate the video recording at trial would not testify about Appellant's "going to the hole" and that the State was offering the evidence only to show that Appellant admitted that he was a "murderer."

At the end of the hearing, the trial court ruled that the probative value of Appellant's statement was not substantially outweighed by the danger of unfair prejudice, noting that the fact that Appellant was in jail for the charged crimes was not overly prejudicial. The court also said:

> I couldn't tell from the video what . . . was going on, other than two people were being taken into a different cell and there was some conversation . . . going around. There was no reference that I could see to any specific incident that led up to them being cuffed while they're

8

inside the jail.

The prosecutor then agreed to instruct the deputy to limit his testimony to the fact that Appellant was being put in a cell when he made the statement. Appellant did not request any limiting instruction to the jury.

On direct examination during the trial, the deputy authenticated the video recording and briefly testified that his body camera recorded him placing Appellant into a cell during an "encounter" with Appellant on August 7, 2019. The prosecutor then played the entire video for the jury. The deputy affirmed that the video was a fair and accurate depiction of the encounter, and the prosecutor ended the examination.

In its order denying Appellant's motion for new trial, the trial court ruled that the admission of the jail video was proper. The court noted that the video showed Appellant "being placed into a cell and having a conversation with staff and another inmate" when he made "an unsolicited statement about being a 'murderer.'" The court then concluded that the video was admissible under Rule 403, that the

fact that Appellant was shown in jail did not put his character at issue, and that the video did not suggest "that [he] had committed an extrinsic bad act or that [he] was being disciplined by the jail staff."

(b) Appellant argues here that the trial court abused its discretion by admitting the jail video into evidence because its probative value was substantially outweighed by undue prejudice under Rule 403 and because it violated his constitutional right to a fair trial and the presumption of innocence.[3] Appellant asserts that the video was highly prejudicial because it showed him in handcuffs and wearing jail attire while being "disciplined by jail guards" and because the time stamp on the video established that he was in jail for the charged crimes while he was awaiting trial.

We address first Appellant's argument that the evidence was

---

[3] Appellant also argues that the admission of the video violated Rule 404 (b), which says in pertinent part that "[e]vidence of other crimes, wrongs, or acts shall not be admissible to prove the character of a person in order to show action in conformity therewith." But as the trial court properly concluded, there was no reference to a specific derogatory "other act" in the video, and Appellant identifies no such act in his brief here. Thus, Rule 404 (b) did not apply.

not admissible under Rule 403, which says in pertinent part that "[r]elevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." The "'exclusion of evidence under Rule 403 is an extraordinary remedy that should be used only sparingly.'" *Jenkins v. State*, 313 Ga. 81, 90 (868 SE2d 205) (2022) (citation omitted).

Appellant's statement, "I'm a murderer," during the jail video was highly probative because he was charged with murder and the statement indicated that after the shooting, he asserted to a law enforcement officer that he had murdered someone, although at trial he maintained that he shot Harris in self-defense. See *Bannister v. State*, 306 Ga. 289, 300 (830 SE2d 79) (2019) (explaining that evidence that the appellant said during a recorded jail call, "'I know I f**ked up. It's all messed up,'" was not unfairly prejudicial and was probative "because it indicated that after the shooting [of the victim, the appellant] believed he had done something wrong"). Moreover, the video allowed the jurors to assess Appellant's credibility directly, as they could see and hear him make the statement.

In addition, as the trial court concluded, the two-minute video, presented with almost no narrative testimony, was not overly prejudicial. See *Bannister*, 306 Ga. at 300 ("[I]n a criminal trial, inculpatory evidence is inherently prejudicial; 'it is only when unfair prejudice substantially outweighs probative value that [Rule 403] permits exclusion.'" (citation omitted)). Contrary to Appellant's primary contention, the video did not clearly depict him being disciplined by the deputy sheriffs. And while Appellant correctly notes that the video showed that he was in jail several months after being arrested, under the circumstances of this case, the jury would not have been unfairly influenced by the fact that a defendant charged with murder was being detained while awaiting trial. Thus, the trial court did not abuse its discretion by concluding that the video was admissible under Rule 403. See, e.g., *Lockhart v. State*, 298 Ga. 384, 387 (782 SE2d 245) (2016) (explaining that evidence that the defendant had been confined in jail in connection with the case at issue did not place his character in evidence, and holding that there was "no inherent prejudice" in the jury's learning that the

defendant was in jail when there was no evidence that it was for a reason other than as a result of the charges at issue). See also *United States v. Arayatanon*, 980 F3d 444, 449-451 (5th Cir. 2020) (holding that the trial court did not abuse its discretion in admitting recorded jail calls because "the fact that [the defendant] had been in custody before trial was not unfairly prejudicial under [the] circumstances"); *United States v. Johnson*, 624 F3d 815, 820-822 (7th Cir. 2010) (holding that recordings of the defendant's phone calls from jail while he was awaiting trial were admissible under Federal Rule of Evidence 403 and rejecting his argument that the evidence placed him in a position similar to a defendant forced to wear prison attire at trial); *State v. Taylor*, 240 SW3d 789, 794-796 (Tenn. 2007) (concluding that a video of the defendant in jail clothes inside a jail cell was significantly probative and was not substantially outweighed by the danger of unfair prejudice under Tennessee's identically worded Rule 403).[4]

---

[4] Because OCGA § 24-4-403 is "materially identical" to Federal Rule of Evidence 403, we look to federal appellate cases for guidance interpreting the federal rule. See *State v. Almanza*, 304 Ga. 553, 556-558 (820 SE2d 1) (2018).

Appellant also argues — for the first time on appeal — that the admission of the jail video violated his constitutional right to a fair trial and the presumption of innocence. Appellant did not object on this ground during the pretrial hearing on his motion to exclude the video or during trial, so we review this claim only for plain error. See *State v. Herrera-Bustamante*, 304 Ga. 259, 263-264 (818 SE2d 552) (2018). See also OCGA § 24-1-103 (d).

> "To show plain error, [Appellant] must point to an error that was not affirmatively waived, the error must have been clear and not open to reasonable dispute, the error must have affected his substantial rights, and the error must have 'seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings.'" We need not analyze all of the elements of this test when, as in this case, the defendant has failed to establish one of them.

*Herrera-Bustamante*, 304 Ga. at 264 (citation omitted). As to the second part of the test, "[a]n error is plain if it is clear or obvious under current law. An error cannot be plain where there is no controlling authority on point" or "if a defendant's theory requires

---

We may also look to other courts' interpretations of their similarly worded evidence rules as persuasive authority. See id. at 560.

the extension of precedent." Id. at 264-266 (citations and punctuation omitted). Appellant has not shown that the admission of the video was clear error under existing and binding precedent.

In Appellant's brief here, he relies on cases holding that a criminal defendant's constitutional rights may be violated when he is shackled or compelled to wear prison clothing *during his trial*. See, e.g., *Deck v. Missouri*, 544 U.S. 622, 626-633 (125 SCt 2007, 161 LE2d 953) (2005) (holding that visibly shackling a defendant in leg irons, handcuffs, and a belly chain in the courtroom during the guilt or penalty phase of his trial, absent any justified state interest, was unconstitutional because it undermined the presumption of innocence, interfered with the defendant's ability to communicate with counsel, and decreased the formal dignity of the courtroom); *Estelle v. Williams*, 425 U.S. 501, 504-505 (96 SCt 1691, 48 LE2d 126) (1976) (holding that a defendant's right to a fair trial was violated when he was compelled to wear identifiable prison clothing during his trial, which was a "constant reminder of the accused's condition" affecting the jury's judgment). But those cases are

15

distinguishable. Appellant does not contend (and the record does not indicate) that he was shackled or forced to wear jail garb at any time during his trial.

And Appellant cites, and we have found, no controlling authority from this Court, or the Supreme Court of the United States, holding that the admission of a video at trial showing a defendant in jail wearing jail attire and handcuffs violated his constitutional rights. Indeed, many other courts have reached the opposite conclusion.[5] Because there is no controlling authority

---

[5] See, e.g., *Reid v. Long*, Case No. 21-1109, 2021 WL 4786631, at \*6-7 (10th Cir. Oct. 14, 2021) (upholding the district court's denial of the defendant's petition for habeas corpus claiming that his constitutional rights were violated by the admission of a video recording of his jail interview with an investigator, which showed him in jail attire and handcuffs, because the 82-minute video did not implicate the concerns discussed in *Estelle*); *Anderson v. Secretary for the Dept. of Corrections*, 462 F3d 1319, 1328-1329 (11th Cir. 2006) (upholding the district court's denial of the defendant's habeas petition and concluding that the admission of a one-and-a-half-minute video of a news broadcast showing him in prison garb and in the custody of prison authorities did not violate his due process rights or the holdings in cases like *Estelle*); *Gates v. Zant*, 863 F2d 1492, 1501-1502 (11th Cir. 1989) (holding that the admission of a 15-minute videotaped confession showing the defendant in handcuffs was not unduly prejudicial and distinguishing cases concluding that shackling a defendant at trial negates the presumption of innocence); *People v. Mims*, Case No. 348311, 2020 WL 7636262, at \*5-8 (Mich. Ct. App. Dec. 22, 2020) (holding that the admission of a 15-minute video depicting the defendant in handcuffs and a belly chain was minimally prejudicial and "not of significant duration or importance in the whole of the trial to negate the presumption of innocence");

supporting Appellant's argument, he has failed to show clear error.

See *Herrera-Bustamante*, 304 Ga. at 264-266. Accordingly, the

*People v. Thames*, 467 P3d 1181, 1191-1192 (Colo. Ct. App. 2019) (concluding that the admission of a video of the defendant in a prison uniform did not violate the presumption of innocence because, unlike the impact of seeing a defendant in prison attire throughout the trial, the video was only one hour and 14 minutes long and therefore was not a constant reminder that would create a continuing prejudicial influence in the minds of the jurors); *Bramlett v. State*, 422 P3d 788, 794 (Okla. Crim. App. 2018) (holding that the admission of a videotaped interview of the defendant in an orange jumpsuit and handcuffs did not dilute the presumption of innocence in the same way as viewing the defendant in such attire throughout trial); *Smith v. State*, 246 S3d 1086, 1105-1107 (Ala. Crim. App. 2017) (rejecting the defendant's argument that the admission of photographs and a recorded statement to law enforcement officers depicting him in handcuffs and leg irons violated the presumption of innocence and explaining that "'[t]his [c]ourt has recognized that there is a distinction between the jury's observing a defendant wearing handcuffs in the courtroom for his or her trial and the jury's observing the defendant wearing handcuffs in a videotape that is shown to the jury during trial'" (citation omitted)); *State v. Clarke*, Case No. CA2015-11-189, 2016 WL 5874478, at *5-6 (Ohio Ct. App. Oct. 3, 2016) (holding that allowing the jury to view a videotaped polygraph examination showing the defendant in jail clothing and leg restraints did not violate the presumption of innocence); *Ritchie v. State*, 875 NE2d 706, 718 (Ind. 2007) (concluding that trial counsel did not provide ineffective assistance by failing to object to recorded interviews of the defendant, which showed him shackled and in jail clothing, because the recordings were admissible and did not implicate the concerns discussed in *Deck*); *Taylor*, 240 SW3d at 796 (holding that permitting the jury to see a video that was less than 10 minutes long depicting the defendant in a cell and wearing an inmate jumpsuit did not violate the defendant's due process rights or the presumption of innocence).

Appellant relies heavily on *Deal v. Commonwealth*, 607 SW3d 652 (Ky. 2020), in which the Kentucky Supreme Court held that a video shown at trial of the defendant in an orange jumpsuit and handcuffs during a police interview two months after his arrest violated his right to due process. See id. at 656-667. But as the cases just cited indicate, *Deal* is an outlier, and it is certainly not binding precedent establishing clear error in Georgia courts.

admission of the brief jail video at issue here was not plain error.

3. Appellant argues that the trial court erred by failing to merge the aggravated assault count because, he asserts, that count should have merged into either the voluntary manslaughter verdict or the felony murder count based on possession of a firearm by a first-offender probationer. Because the voluntary manslaughter verdict was vacated by operation of law, however, there was no voluntary manslaughter conviction into which the aggravated assault count could merge. See *Crayton v. State*, 298 Ga. 792, 800-801 (784 SE2d 343) (2016). *Crayton* also rejected the argument that a count charging aggravated assault with a deadly weapon merges with a count charging felony murder based on unlawful possession of a firearm when those crimes are based on the same conduct. See id. at 801. See also *DuBose v. State*, 299 Ga. 652, 654 (791 SE2d 9) (2016) (explaining that "this Court recently held in *Crayton* . . . that sentencing a defendant in virtually identical circumstances for both felony murder (predicated on unlawful possession of a firearm) and aggravated assault (assault by use of a deadly weapon) was proper");

18

*Lawson v. State*, 280 Ga. 881, 883 (635 SE2d 134) (2006). Thus, the trial court did not err in sentencing Appellant for both felony murder and aggravated assault.

*Judgment affirmed. All the Justices concur.*

Decided May 3, 2022.

Murder. Clarke Superior Court. Before Judge Stephens.

*David T. Douds*, for appellant.

*Deborah Gonzalez, District Attorney, Robert D. Schollmeyer, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Michael A. Oldham, Assistant Attorney General*, for appellee.