NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: June 26, 2025

S25A0023. LEWIS v. THE STATE.

WARREN, Presiding Justice.

In 2021, Aaron Lewis was indicted in Gwinnett County for the felony murders of Dieterick Stephen Duncker and Alexandria Thompson and for other related crimes. In the indictment, the State alleged that the predicate felony on which Counts 1, 2, 5, and 6 were based was "the sale and distribution of fentanyl . . . . in DeKalb County." The State also alleged that Lewis "selling heroin that contained fentanyl" to Duncker and Thompson "caused [Duncker and Thompson] to overdose and die in Gwinnett County."

Contending that venue was not proper in Gwinnett County, Lewis filed a motion to dismiss (and later an amended motion to dismiss) Counts 1, 2, 5, and 6—the felony-murder counts predicated on the "sale and distribution" of heroin that contained fentanyl. The

trial court denied Lewis's amended motion to dismiss and granted a certificate of immediate review. We granted Lewis's interlocutory application to review the trial court's ruling on venue.

As explained more below, we vacate the trial court's order denying Lewis's amended motion to dismiss. We do so because the trial court anchored its venue analysis on *Eubanks v. State*, 317 Ga. 563 (894 SE2d 27) (2023)—a case in which this Court evaluated a defendant's post-conviction claim that the evidence presented at trial was not sufficient as a matter of constitutional due process to sustain her conviction for felony murder. But *Eubanks* is not a case about venue, and this Court provided no analysis of OCGA § 17-2-2 (c)—the criminal-homicide statutory venue provision—in that case. We therefore vacate the trial court's order and remand for further proceedings consistent with this opinion.

1. *Background*

In May 2021, Lewis was indicted in Gwinnett County on eight counts related to the deaths of Duncker and Thompson, including felony murder. According to the indictment, Lewis sold and

distributed fentanyl-laced heroin to Duncker during the night of February 12 to 13, 2020, and Duncker died on February 13; Lewis then sold and distributed fentanyl-laced heroin to Thompson on February 15, and she died later that same day.[1] As relevant to this appeal, Lewis was indicted by a Gwinnett County grand jury for one count of felony murder predicated on the sale and distribution of fentanyl in violation of OCGA § 16-13-30 (b)[2] for the murder of

---

[1] A person commits felony murder when, "in the commission of a felony, he or she causes the death of another human being irrespective of malice." OCGA § 16-5-1 (c).

[2] OCGA § 16-13-30 (b) proscribes (among other offenses) the sale and distribution of controlled substances and provides that "[e]xcept as authorized by this article, it is unlawful for any person to manufacture, deliver, distribute, dispense, administer, sell, or possess with intent to distribute any controlled substance." See OCGA § 16-13-30 (b). OCGA § 16-13-25, in turn, lists Schedule I controlled substances, and at the time of Lewis's indictment provided:

> The controlled substances listed in this Code section are included in Schedule I:
>
> …
>
> (2) Any of the following opium derivatives, their salts, isomers, and salts of isomers, unless specifically excepted, whenever the existence of these salts, isomers, and salts of isomers is possible within the specific chemical designation:
>
> …
>
> (J) Heroin;
>
> …
>
> (13) The fentanyl analog structural class, including any of the following derivatives, their salts, isomers, or salts of isomers, unless specifically utilized as part of the manufacturing process by

3

Duncker (Count 1); one count of felony murder predicated on the sale and distribution of heroin in violation of OCGA § 16-13-30 (b) for the murder of Duncker (Count 2); one count of felony murder predicated on the sale and distribution of fentanyl in violation of OCGA § 16-13-30 (b) for the murder of Thompson (Count 5); and one count of felony murder predicated on the sale and distribution of heroin in violation of OCGA § 16-13-30 (b) for the murder of Thompson (Count 6), among other offenses.

For each of the four counts listed above, the indictment alleged that Lewis committed

> murder when [he] caused the death of [Duncker and Thompson] irrespective of malice while in the commission of a felony, to wit: the sale and distribution of [fentanyl and heroin] in violation of OCGA § 16-13-30 (b), by selling [Duncker and Thompson], in De[K]alb County, heroin that contained fentanyl which caused [Duncker and Thompson] to overdose and die in Gwinnett County.

---

a commercial industry of a substance or material not intended for human ingestion or consumption, as a prescription administered under medical supervision, or for research at a recognized institution, whenever the existence of these salts, isomers, or salts of isomers is possible within the specific chemical designation or unless specifically excepted or listed in this or another schedule, structurally derived from fentanyl, and whether or not further modified . . . .
OCGA §§ 16-13-25 (2) (J); 16-13-25 (13).

In December 2022, Lewis filed a motion to dismiss the indictment based on "lack of venue" and later filed an amended motion moving to dismiss Counts 1, 2, 5, and 6 of the indictment on the same basis. In February 2024, the trial court held a hearing to consider Lewis's amended motion, which it later denied. In its order, the trial court acknowledged that "[t]he indictment alleges that the sale of drugs led to the cause of deaths. The sales occurring in DeKalb County and the deaths occurring as a result of an overdose which occurred in Gwinnett County." However, the trial court determined that "Gwinnett County is the location in which the cause of death, the ingestion of the narcotics, and the res gestae of [Lewis's] actions resulted" and "[t]he ingestion of narcotics [was] the naturally and reasonably foreseeable result of the purchase of narcotics." The trial court thus concluded that venue was proper in Gwinnett County, denied Lewis's amended motion to dismiss, and granted a certificate of immediate review. We granted Lewis's timely-filed interlocutory application to this Court and held oral

5

argument on November 5, 2024.

## 2. *Standard of Review*

"We apply a de novo standard of review to [a] trial court's ruling on [a] motion to dismiss the indictment for improper venue." *State v. Al-Khayyal*, 322 Ga. App. 718, 719 (744 SE2d 885) (2013), disapproved of on other grounds by *Hill v. State*, 360 Ga. App. 143 (860 SE2d 893) (2021).[3]

## 3. *Analysis*

The Georgia Constitution provides that "all criminal cases

---

[3] Though Lewis styled his pretrial motion as a "motion to dismiss," he contends in his appellate brief that the motion "was in substance a general demurrer." "A general demurrer challenges the sufficiency of the substance of the indictment, and asks whether it is capable of supporting a conviction." *Clark v. State*, 315 Ga. 423, 442-443 (883 SE2d 317) (2023) (citation and punctuation omitted). As noted below, our Court appears to have acknowledged in criminal cases both motions to dismiss based on venue as well as general demurrers challenging the sufficiency of the indictment based on venue. See *McKinney v. State*, 282 Ga. 230, 232 (647 SE2d 44) (2007). It is not clear to us what substantive difference there is, if any, between these two procedural vehicles. But we do not have to resolve that question to resolve this case, and in any event, this Court's review of a "trial court's ruling on a general demurrer is de novo" as well. See *Budhani v. State*, 306 Ga. 315, 319 (830 SE2d 195) (2019) ("This Court reviews a trial court's ruling on a general demurrer de novo in order to determine whether the allegations in the indictment are legally sufficient.") (cleaned up).

shall be tried in the county where the crime was committed."[4] Ga.

Const. of 1983, Art. VI, Sec. II, Par. VI. Georgia statutory law

further explains that in cases of criminal homicide (which includes

felony murder), the criminal homicide "shall be considered as having

been committed in the county in which the cause of the death was

inflicted." OCGA § 17-2-2 (c).[5]

Venue is a jurisdictional fact that the State must prove beyond

a reasonable doubt in every criminal case. See *Hernandez v. State*,

---

[4] Ga. Const. of 1983, Art. VI, Sec. II, Par. VI provides in full:
All other civil cases, except juvenile court cases as may otherwise be provided by the Juvenile Court Code of Georgia, shall be tried in the county where the defendant resides; venue as to corporations, foreign and domestic, shall be as provided by law; and all criminal cases shall be tried in the county where the crime was committed, except cases in the superior courts where the judge is satisfied that an impartial jury cannot be obtained in such county.

[5] The full text of OCGA § 17-2-2 (c) says:
*Criminal homicide.* Criminal homicide shall be considered as having been committed in the county in which the cause of death was inflicted. If it cannot be determined in which county the cause of death was inflicted, it shall be considered that it was inflicted in the county in which the death occurred. If a dead body is discovered in this state and it cannot be readily determined in what county the cause of death was inflicted, it shall be considered that the cause of death was inflicted in the county in which the dead body was discovered.

304 Ga. 895, 898 (823 SE2d 272) (2019). But at the outset of a criminal case—well before a case may be tried—the State must allege venue in the indictment. See, e.g., *Leverette v. State*, 291 Ga. 834, 836 (732 SE2d 255) (2012) (acknowledging that in a criminal case, an indictment must "set forth the Georgia county in which the crime is alleged" to withstand a venue challenge); *Armstrong v. State*, 286 Ga. 420, 421 (688 SE2d 629) (2010) (acknowledging that in a criminal case, venue is a "material allegation of an indictment"). Indeed, it has long been the standard in Georgia that the State, in a criminal case, must allege "that the crime was committed in the county in which such indictment or accusation was proceeding"— and that the failure to do so would make "the indictment or accusation [] demurrable." *Conley v. State*, 83 Ga. 496, 498 (10 SE 123) (1889).

Georgia appellate courts have acknowledged pretrial challenges to indictments on the basis of venue made by filing a general demurrer or a pretrial motion seeking dismissal of the indictment. See, e.g., *McKinney v. State*, 282 Ga. 230, 232 (647 SE2d

8

44) (2007) (after defendants filed motions to dismiss and general demurrers challenging their indictments based on venue, reversing the trial court's denial of the motions to dismiss for lack of venue); *State v. Stubbs*, 365 Ga. App. 630, 632 (879 SE2d 716, 718) (2022) (rejecting the State's contention that "the trial court erred in considering the issue of venue in the context of a pretrial motion seeking dismissal of the accusation" and "instead must reserve the matter for the jury").

In evaluating whether to sustain a demurrer, a court generally "cannot go beyond the four corners of the indictment." *State v. Williams*, 306 Ga. 50, 53 (829 SE2d 117) (2019).[6] See also *Stubbs*, 365 Ga. App. at 632 ("In ruling on [a pretrial motion to dismiss], the trial court cannot resolve disputed questions of fact pertaining to venue, which are reserved for the jury.") (citing cases). "There is an

---

[6] Given his characterization of the amended motion to dismiss as "in substance a general demurrer," Lewis cites case law pertaining to this Court's review of a general demurrer and does not offer a different substantive standard for reviewing a pretrial motion to dismiss in a criminal case. Likewise, the State references Lewis's "motion to dismiss and general demurrer" and cites a standard of review for this Court that pertains to general demurrers.

important exception to the general rule," however: "If the State stipulates or agrees to the facts that form the basis for the charges in the indictment, a court can rely on those facts in its consideration of a demurrer, whether or not the facts appear on the face of the indictment." *Williams*, 306 Ga. at 53. We are aware of no such stipulations in this case.[7]

Lewis contends that the trial court erred in denying his amended motion to dismiss because the State failed properly to allege venue with respect to Counts 1, 2, 5, and 6 of the indictment.[8] As part of that argument, Lewis contends—and we agree—that the

---

[7] The trial court purported to find that that "the parties agree . . . that the predicate sales of drugs occurred in DeKalb County and the overdoses and deaths occurred in Gwinnett County." However, in his brief on appeal, Lewis represents—and the State agrees—that "[d]uring the hearing there were no express stipulations of fact by the parties," despite the trial court's purported ruling that "'[t]he indictment alleges, and the parties agree, that the predicate sales of drugs occurred in DeKalb County and the overdoses and deaths occurred in Gwinnett County.'" It is worth emphasizing that, given the procedural posture in this case, the trial court has not made any findings of fact.

[8] Our analysis is limited to Counts 1, 2, 5, and 6 of the indictment—the Counts on which Lewis based his motion to dismiss. We do not consider whether venue is proper in Gwinnett County for Counts 3, 4, 7, and 8.

trial court's reliance on *Eubanks* in its venue analysis was misplaced.

Indeed, the trial court veered off course when it applied, at the State's urging, a proximate-cause analysis based on this Court's decision in *Eubanks*.[9] Pointing to this Court's determination in *Eubanks* that the victim's "exposure to heroin was a reasonably foreseeable consequence of [the defendant's] conduct," see id. at 576, the trial court reasoned that venue for Lewis's felony-murder prosecution was proper in Gwinnett County because Duncker's and Thompson's ingestion of narcotics was "the natural and reasonably foreseeable result of the purchase of [the] narcotics" Lewis was alleged to have sold them. But the issue Lewis raised in his motion to dismiss was not one of proximate cause (that is, whether his

---

[9] In *Eubanks v. State*, we evaluated a defendant's claim that the evidence was not sufficient as a matter of constitutional due process to sustain her conviction for felony murder, where the record showed that the defendant "brought and kept a large amount of a lethal drug into a home where a severely developmentally disabled person lived and [she] conducted a transaction for the drug, which led to it spilling . . . in an area to which that vulnerable person had free access." 317 Ga. 563, 576 (894 SE2d 27) (2023). We held that the evidence was constitutionally sufficient in that case because the victim's "exposure to the heroin was a reasonably foreseeable consequence of [the defendant's] conduct." Id.

11

alleged sale of drugs could be the proximate cause of Duncker's and Thompson's deaths), but rather one of *venue*. The relevant question for purposes of venue here is in which "county . . . the cause of death was inflicted" under OCGA § 17-2-2 (c), based on the challenged counts of the indictment as the State alleged them.

Because the trial court erred by applying the *Eubanks* proximate-cause framework to a venue question, we vacate the trial court's order and remand for further proceedings consistent with this opinion.

*Judgment vacated and remanded. Peterson, CJ, and Bethel, Ellington, McMillian, LaGrua, Colvin, and Pinson, JJ, concur.*

WARREN, Presiding Justice, concurring.

With limited exception, the Georgia Constitution requires criminal cases to be "tried in the county where the crime was committed." Ga. Const. of 1983, Art. VI, Sec. II, Par. VI.[10] Georgia statutory law further explains that felony murder—a type of criminal homicide—"shall be considered as having been committed in the county in which the cause of the death was inflicted." OCGA § 17-2-2 (c).

In most criminal homicide cases, identifying the proper venue is a straightforward exercise: the county in which a defendant "inflict[s]" a homicide victim's "cause of death," see OCGA § 17-2-2 (c), is more often than not obvious in cases of shooting, stabbing, strangling, or blunt-force trauma, where a perpetrator imposes significant and immediate harm on a victim. But the key venue question presented in this interlocutory appeal does not involve these types of criminal homicide, and it is far less straightforward:

---

[10] The Georgia Constitution excepts from this general rule "cases in superior courts where the judge is satisfied that an impartial jury cannot be obtained in such county." Ga. Const. of 1983, Art. VI, Sec. II, Par. VI.

13

when a defendant is charged with felony murder predicated on the sale and distribution of drugs, and the conduct underlying the predicate felony is alleged to have been completed in one county, but the death by drug overdose allegedly caused by the commission of that felony occurs in another county, in which "county [was] the cause of death . . . inflicted" for purposes of venue?  See OCGA § 17-2-2 (c).

Today's majority opinion, in which I concur fully, offers a unanimous—but narrow—answer: when evaluating venue for felony murder under OCGA § 17-2-2, applying the *Eubanks* proximate-cause analysis is not the correct legal framework.  But because this issue will recur—not only in this case, but in others—and because trial courts and district attorneys would benefit from guidance about this important venue issue, I write separately to shed some light on the questions this Court asked upon granting Lewis's interlocutory application but did not answer in the majority opinion.  Those questions center around how to determine, in a criminal-homicide case, "the county in which the cause of death was inflicted" for

14

purposes of venue.  See OCGA § 17-2-2 (c).[11]

The bottom line is this: it seems clear that a defendant's *conduct* (as opposed to the *result* of a defendant's conduct) is the touchstone of the analysis of the "county in which the cause of death was inflicted" under OCGA § 17-2-2 (c).  That conclusion is one the trial court in this case—and trial courts in other cases—should carefully consider.  And although it seems that the construction of OCGA § 17-2-2 (c) I offer below would apply in this felony-murder case and in many others, I am not sure whether that construction of OCGA § 17-2-2 (c) would work in certain other felony-murder cases in a way that is consistent with my proposed application of the

---

[11] Those questions are:
1. When a defendant is charged with felony murder predicated on the sale or distribution of drugs and his conduct underlying the predicate felony is alleged to have been completed in one county, but the death by drug overdose allegedly caused in the commission of that felony occurs in another county, what is the "cause of death"? OCGA § 17-2-2 (c).  For example, is the "cause of death" the defendant's alleged affirmative conduct (the sale of drugs), the apparent immediate cause of death (drug overdose), either of those things, both of those things, or something else?
2. Under the above circumstances, in which county or counties was the "cause of death" "inflicted?" See id.
3. Under the above circumstances, could venue be proper in both counties?

15

statute in this case; is consistent with other convictions for felony murder this Court has upheld on appeal; and otherwise meets Georgia's constitutional and statutory venue requirements.[12]

On remand, however, the trial court is faced only with assessing venue in *this* case based on the counts of the indictment as the State has alleged them here. Acknowledging that this is a difficult task, I offer in this concurrence the best venue rule I have been able to formulate—as well as an application of that rule to the relevant counts of the indictment in this case.

*

1. The majority opinion lays out much of the factual background and procedural history relevant to this appeal. But to aid my analysis of OCGA § 17-2-2 (c), I review some of it here. In May 2021, Aaron Lewis was indicted in Gwinnett County on eight

---

[12] That is likely because OCGA § 17-2-2 (c)—which was enacted in 1968, decades before fentanyl became the all-too-common scourge it is today—does not appear to have contemplated, and does not appear to neatly fit, the theory of felony murder the State pursues here. In other words (and as Justice Bethel also points out in his concurring opinion): Georgia's criminal-homicide venue statute is a round hole, and the theory of felony murder the State advances in this case in Counts 1, 2, 5, and 6 (that is, felony murder predicated on the sale and distribution of illegal drugs laced with fentanyl) is a square peg.

counts related to the deaths of Duncker and Thompson, including felony murder. As relevant to this appeal, Lewis was indicted by a Gwinnett County grand jury for one count of felony murder predicated on the sale and distribution of fentanyl in violation of OCGA § 16-13-30 (b) for the murder of Duncker (Count 1); one count of felony murder predicated on the sale and distribution of heroin in violation of OCGA § 16-13-30 (b) for the murder of Duncker (Count 2); one count of felony murder predicated on the sale and distribution of fentanyl in violation of OCGA § 16-13-30 (b) for the murder of Thompson (Count 5); and one count of felony murder predicated on the sale and distribution of heroin in violation of OCGA § 16-13-30 (b) for the murder of Thompson (Count 6), among other offenses.

For each of the four counts listed above, the indictment alleged that Lewis committed

> murder when [he] caused the death of [Duncker and Thompson] irrespective of malice while in the commission of a felony, to wit: the sale and distribution of [fentanyl and heroin] in violation of OCGA § 16-13-30 (b), by selling [Duncker and Thompson], in De[K]alb County, heroin

17

that contained fentanyl which caused [Duncker and Thompson] to overdose and die in Gwinnett County.

Counts 1, 2, 5, and 6 of the indictment did not allege any other conduct by Lewis that pertained to the deaths of Duncker and Thompson.

2. Lewis contends that the trial court erred in denying his amended motion to dismiss because the State failed properly to allege venue with respect to Counts 1, 2, 5, and 6 of the indictment.[13] In particular, he argues that DeKalb County is "where the predicate offense was committed" and that "[t]here is no allegation that [Lewis] took any action establishing venue in Gwinnett." I agree that a defendant's conduct—as opposed to the result of his conduct—is the touchstone of the inquiry into which "county . . . the cause of death was inflicted" under OCGA § 17-2-2 (c).[14]

_____

[13] Like the analysis in the majority opinion, my analysis is limited to Counts 1, 2, 5, and 6 of the indictment—the Counts on which Lewis based his motion to dismiss. I do not consider whether venue is proper in Gwinnett County for Counts 3, 4, 7, and 8.

[14] The full text of OCGA § 17-2-2 (c) says:
*Criminal homicide.* Criminal homicide shall be considered as having been committed in the county in which the cause of death

18

(a) As noted above, the Georgia Constitution provides that "all criminal cases shall be tried in the county where the crime was committed."[15]  Ga. Const. of 1983, Art. VI, Sec. II, Par. VI.  We generally construe Georgia statutes against the backdrop of the Georgia Constitution and, when possible, interpret them in a way that is harmonious with our Constitution.  See, e.g., *In the Interest of M.D.H.*, 300 Ga. 46, 53 (793 SE2d 49) (2016) ("We construe statutes in connection and in harmony with the existing law"—including the Georgia Constitution—"as a part of a general and uniform system of jurisprudence") (cleaned up); Antonin Scalia &

was inflicted. If it cannot be determined in which county the cause of death was inflicted, it shall be considered that it was inflicted in the county in which the death occurred. If a dead body is discovered in this state and it cannot be readily determined in what county the cause of death was inflicted, it shall be considered that the cause of death was inflicted in the county in which the dead body was discovered.

[15] Ga. Const. of 1983, Art. VI, Sec. II, Par. VI provides in full: All other civil cases, except juvenile court cases as may otherwise be provided by the Juvenile Court Code of Georgia, shall be tried in the county where the defendant resides; venue as to corporations, foreign and domestic, shall be as provided by law; and all criminal cases shall be tried in the county where the crime was committed, except cases in the superior courts where the judge is satisfied that an impartial jury cannot be obtained in such county.

Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 180 (2012) ("The provisions of a text should be interpreted in a way that renders them compatible, not contradictory."). That interpretive principle is important, because "if a statutory rule contradicts a constitutional rule, then the constitutional rule prevails." *Carpenter v. McMann*, 304 Ga. 209, 211 (817 SE2d 686) (2018).

OCGA § 17-2-2 (c)—Georgia's venue statute for criminal homicide (which includes felony murder)—can be read harmoniously with Ga. Const. of 1983, Art. VI, Sec. II, Par. VI. That is because the statutory term "inflicted" effectuates the Georgia Constitution's venue requirement that criminal cases "be tried in the county where the crime was *committed*." See Ga. Const. of 1983, Art. VI, Sec. II, Par. VI (emphasis added); see also OCGA § 17-2-2 (a) ("*In general.* Criminal actions shall be tried in the county where the crime was committed, except as otherwise provided by law.").

This harmonious reading underscores an important feature of the venue question at issue today: both the Georgia Constitution and

the criminal-homicide venue statute point to a defendant's *conduct* in determining where venue shall lie in criminal cases. And this is one of the data points that leads to my basic conclusion that conduct is the touchstone of the inquiry into which "county . . . the cause of death was inflicted" under OCGA § 17-2-2 (c).

There's good evidence to support this interpretation. Dictionaries from around 1968—the year the statute's "inflicted" language was enacted[16]—generally define "inflict" as causing or imposing harm or pain.[17] See, e.g., The American Heritage Dictionary of the English Language 674 (1969) (defining "inflict" as

---

[16] See Ga. L. 1968, p. 1249, § 1. The text of OCGA § 17-2-2 (c) has not changed since its enactment in 1968. Notably, the statutory precursors to OCGA § 17-2-2 (c) did not include the word "inflict." See, e.g., Code of 1933, p. 844, § 27-1104 ("When any mortal wound shall be given, or any poison shall be administered, or any other means shall be employed in one county, by which a human being shall be killed, who shall die thereof in another county, the indictment shall be found and the offender shall be tried in the county where the act was performed or done from which the death ensued."). See also Irwin's Code of 1868 § 4577; Code of 1860 § 4557; Cobb's 1851 Digest, p. 840, ¶ 335, § 42.

[17] See, e.g., *Camp v. Williams*, 314 Ga. 699, 702 (879 SE2d 88) (2022) ("[R]eviewing dictionaries from the era of the statute's enactment may assist in determining its meaning.") (citation and punctuation omitted); *State v. SASS Grp., LLC*, 315 Ga. 893, 898-899 (885 SE2d 761) (2023) ("One place to look for ordinary meaning is contemporaneous dictionaries from around the time when the text was adopted.").

"[t]o cause or carry out by physical assault or other aggressive action" and "to impose"); Webster's Third New International Dictionary 1160 (1966) (defining "inflict" as "to lay (a blow)"; "cause (something damaging or painful) to be endured"; and "to impose"); The Random House Dictionary of the English Language 730 (1966) (defining "inflict" as "to lay on"; "to impose as something that must be borne or suffered"; and "to impose (anything unwelcome)"). And these definitions are generally consonant with the Georgia Constitution, which provides that "all criminal cases shall be tried in the county where the crime was *committed*." Ga. Const. of 1983, Art. VI, Sec. II, Par. VI (emphasis added). Georgia's Constitution has contained some version of a venue provision requiring that criminal cases be tried in the county in which they are "committed" since 1777, and OCGA § 17-2-2 (c) was enacted against this constitutional backdrop. Examples of definitions of "commit" contemporaneous to the first enactment of that term in Georgia's constitutional venue provision include: "[t]o perpetrate; to do fault; to be guilty of a crime" and "to . . . do." See, e.g., Samuel Johnson, 1

22

A Dictionary of the English Language 520 (4th ed. 1777) (defining "commit" as "[t]o perpetrate; to do fault; to be guilty of a crime"); Noah Webster, A Compendious Dictionary of the English Language 58 (1806) (defining "commit" as "to . . . do"); Noah Webster, American Dictionary of the English Language 420-421 (New York, S. Converse 1828) (defining "commit" as "[t]o do; to effect or perpetrate; as, to commit murder, treason, felony, or trespass" and defining "committed" as "done" and "perpetrated").

The upshot of these definitions is that they contemplate *conduct:* a person who "inflicts" is a person who takes action imposing harm on—or at a minimum, directs harmful conduct toward—another person.[18]  Reading OCGA § 17-2-2 (c) in this light, I would conclude that the plain meaning of "inflicted," as used in the phrase "the county in which the cause of death was inflicted," contemplates *conduct* a defendant directs towards a person that is

---

[18] The dictionary definitions referenced above also contemplate harm imposed on a *thing*.  But since we are examining the relevance of these definitions in the context of criminal homicide, I address only how the definition of "inflict" applies to harm imposed on a person.

connected to the criminal homicide the State alleges and that ultimately causes the death of that person.[19] It follows that for a criminal-homicide count of an indictment to survive a general demurrer or a motion to dismiss based on venue under OCGA § 17-2-2 (c), the State must allege—at a minimum—that in the county in which the criminal homicide count was indicted, the defendant directed conduct toward a person that is connected to the criminal homicide the State alleges, and that the State alleges ultimately caused the death of that person.

(b) The State has not done so here. The State alleged in Counts 1, 2, 5, and 6 that Lewis committed felony murder "by selling [Duncker and Thompson], in De[K]alb County, heroin that contained fentanyl which caused [Duncker and Thompson] to

---

[19] This conclusion is consistent with *Jones v. State*, 301 Ga. 1 (799 SE2d 196) (2017), disapproved on other grounds by *Worthen v. State*, 304 Ga. 862, 874 n.8 (823 SE2d 291) (2019). There, we held that venue was proper in Fulton County under OCGA § 17-2-2 (c) when the victims "died because bullets struck their bodies and 'inflicted' fatal injuries" and "[t]he evidence showed that the victims' causes of death were inflicted in Fulton County[.]" *Jones*, 301 Ga. at 4-5. And although we did not determine the county in which the defendant fired the gun whose bullets "inflicted" the fatal injuries in that case, it is clear that the defendant engaged in conduct directed towards the victims in Fulton County that caused their deaths by shooting toward the victims in that county.

overdose and die in Gwinnett County." To the extent the State alleged that Lewis engaged in any type of conduct directed toward Duncker and Thompson, it alleged that he did so in DeKalb County, where it alleged that Lewis sold and distributed "heroin that contained fentanyl" to them. By contrast, the State did not allege that Lewis engaged in *any* conduct in Gwinnett County with respect to the felony-murder counts, let alone that he engaged in conduct directed toward Duncker and Thompson there. Thus, applying the construction of "inflicted" in OCGA § 17-2-2 (c) offered above, I would conclude that DeKalb County is the only county in which the jury could possibly find that "the cause of death was inflicted" based on this indictment.[20] See OCGA § 17-2-2 (c). This analysis supplies an additional basis on which I would conclude that the trial court erred by determining that venue was proper in Gwinnett County with

---

[20] Interestingly, the State acknowledges in its appellate brief that venue is proper in DeKalb County because that is "the county of the defendant's initial affirmative conduct." It nonetheless asserts that venue is *also* proper in Gwinnett County because that is "the county in which the death resulting from that affirmative conduct occurs." That argument, which focuses on the *result* of the conduct the State alleges, rather than on Lewis's conduct (as alleged by the State), suffers from the maladies explained in Division 3.

respect to Counts 1, 2, 5, and 6.

3. The majority opinion explains that the trial court "veered off course" by applying a proximate-cause analysis based on this Court's decision in *Eubanks v. State*, 317 Ga. 563 (894 SE2d 27) (2023). But I see additional missteps in the trial court's venue analysis in light of the definition of "inflicted" I lay out above.

In particular, the trial court adopted the State's argument that "the cause of death was inflicted where the ingestion of the narcotics took place (Gwinnett County)[,]" even though it also acknowledged that "the predicate sale of drugs occurred in DeKalb County." This led the trial court to conclude that venue was proper in Gwinnett County (and to deny Lewis's motion to dismiss) because that was "the location in which the cause of death, the ingestion of the narcotics, and the res gestae of the Defendant's actions resulted."

In my view, however, the proper venue inquiry under OCGA § 17-2-2 (c) does not pinpoint the county in which the "cause of death" or "the Defendant's actions resulted," but rather the county in which the defendant engaged in conduct directed toward a person

26

that is connected to the criminal homicide alleged by the State and ultimately causes that person's death. Here, the State did not allege that Lewis engaged in any conduct in Gwinnett County that was directed toward Duncker and Thompson. Instead, the State indicted felony murder in Counts 1, 2, 5, and 6 predicated on "the sale and distribution" of drugs, which the State alleges took place in DeKalb County. Thus, according to the State's indictment, the only county in which Lewis engaged in conduct directed toward Duncker and Thompson at all, and thus the only county in which he could have potentially "inflicted" the cause of death, see OCGA § 17-2-2 (c), is in DeKalb County.[21]

4. Notwithstanding the evidence I offer of the plain meaning of "inflicted" and the analysis of how that term is used in OCGA § 17-

---

[21] The State contends that venue may be proper in Gwinnett County because the jury is permitted to find venue "by *any* applicable subsection in OCGA § 17-2-2" and it is possible that the jury could conclude that "it cannot be determined in which county the cause of death was inflicted" under OCGA § 17-2-2 (h). But the jury would not be authorized to reach that conclusion based on this indictment, where the State has alleged that the only conduct Lewis engaged in directed toward Duncker and Thompson (that is, the sale and distribution of fentanyl-laced drugs) that caused their deaths occurred in DeKalb.

2-2 (c), I am not certain that the construction I offer here would map neatly on to *all* of the felony-murder cases for which the venue inquiry is controlled by OCGA § 17-2-2 (c). For example, it is not clear to me whether and how this definition would operate under OCGA § 17-2-2 (c) when the theory of felony murder the State indicts is one in which the defendant is alleged to have proximately caused the death of a person but is not alleged to have "directed" any conduct toward that homicide victim. See, e.g., *Menzies v. State*, 304 Ga. 156, 161 (816 SE2d 638) (2018) (evidence was sufficient to support defendant's conviction for felony murder when her accomplice was fatally shot during an attempted armed robbery); *Robinson v. State*, 298 Ga. 455, 456, 458-459 (782 SE2d 657) (2016) (evidence was sufficient to support defendant's conviction for felony murder when his accomplice was fatally shot by a store owner they were attempting to rob); *Thornton v. State*, 292 Ga. 87, 88 (734 SE2d 393) (2012) (evidence was sufficient to support defendant's conviction for felony murder when he drove himself and others to the location where the crime occurred, stayed in his vehicle during

28

the crime, and drove the getaway car).  It is equally unclear to me whether a venue challenge would ever actually arise in such a scenario.

There are other uncertainties, too.  For example, it is not clear precisely what "cause of death" means as it is used in OCGA § 17-2-2 (c).  Is it a term of art (such as the "cause of death" that is announced by a medical examiner), or does it merely indicate that a defendant *caused the death* of a person?  It is not difficult to see the oddities this uncertainty presents in a case like this one, where the felony-murder counts the State indicts are predicated on the sale or distribution of drugs—such that the State alleges the defendant "inflicted" the "cause of death" (and did not merely proximately cause the death) by selling drugs.

But I need not resolve these questions to offer a well-supported construction of the meaning of "inflicted," as used in the phrase "the county in which the cause of death was inflicted," OCGA § 17-2-2 (c), so that the trial court and the District Attorney may consider these points on remand.

I am authorized to state that Justice Colvin joins in this concurrence.

BETHEL, Justice, concurring.

I concur with the judgment of the Court vacating and remanding this case for the trial court to apply the proper venue analysis. I generally believe the Presiding Justice has laid out a persuasive argument in her concurrence for how we might sort out venue in cases based on the theory advanced by the State here. But, candidly, I do not know how this theory of felony murder can fit into our felony murder and venue jurisprudence as it currently exists. With that state of affairs in mind, I write separately to examine two challenging issues presented in this case that could benefit from clear guidance from our General Assembly. First, I call attention to a legal question that, while not directly raised as an issue on appeal, lurks in the background of this case – namely, whether a felony murder charge is even cognizable under the circumstances presented in this case. Second, I note the strain the State's theory of felony murder places on determining venue under our existing statutory scheme. Here, we have vacated and remanded this case for

31

the trial court to wrestle with the venue question, though we have done so without providing significant guidance for resolving that question beyond pointing to our prior precedent and, of course, the statutory language. As I see it, the interplay of the felony murder statute and the venue statute is not clearly delineated in our Code and, thus, raises an inherent challenge in resolving the venue question presented by this case. The Presiding Justice's proposed approach may prove helpful, but trying to reconcile that approach within the full context of our felony murder and venue jurisprudence and statutory schemes is difficult. In short, I do not think the legal tools that the State seeks to employ here were designed to be used on this job.

Lewis was indicted on four counts of felony murder — two counts predicated on the sale and distribution of fentanyl and two counts predicated on the sale and distribution of heroin — with the State alleging that Lewis sold the drugs to the victims in DeKalb County which "caused [the victims] to overdose and die in Gwinnett County." Lewis challenged the indictment for lack of venue. But it

seems to me that the bigger question here is whether the State has charged a valid crime — that is, whether a felony murder charge can be properly predicated on the sale and distribution of illicit drugs where the purchaser, in a time and place remote from the completed sale and distribution of the drugs, consumes the drugs and dies as the result of an overdose.

Georgia law provides that a person commits felony murder when, "in the commission of a felony, he or she causes the death of another human being, irrespective of malice." OCGA § 16-5-1 (c). To obtain a conviction on a felony murder charge, the State must establish three "related prerequisites": (1) the predicate felony was "one from which it was reasonably foreseeable that death could result," that is, it was "inherently dangerous"; (2) the death was in fact "the probable or natural consequence of the defendant's conduct," a concept otherwise known as proximate cause; and (3) the death was caused "in the commission of" the predicate felony. *Eubanks v. State*, 317 Ga. 563, 568 (2) (a) (894 SE2d 27) (2023). While I have some questions about the State's ability to prove the

33

first two requirements,[22] there is serious doubt in my mind about the State's ability to prove the third under the circumstances of this case. Let me explain.

As this Court has acknowledged, the in-the-commission-of requirement constitutes a statutory limit on how "attenuated in time, in place, and most significantly, in circumstance" the predicate felony and homicide can be. Id. at 573 (2) (a) (iii) (citation and punctuation omitted). While "[a] murder may be committed in the commission of a felony, although it does not take place until after the felony itself has been technically completed," *Lee v. State*, 270

---

[22] For example, I question whether the predicate felonies here constitute "inherently dangerous" felonies, such that it was reasonably foreseeable that the victims' deaths could result. Of course, this Court has issued numerous decisions recognizing that drug sales are foreseeably dangerous and violent and, on that basis, rejecting sufficiency challenges premised on a lack of foreseeability. See, e.g., *Hood v. State*, 303 Ga. 420, 423 (1) (b) (811 SE2d 392) (2018) (collecting cases). But factual context is important. See *Davis v. State*, 290 Ga. 757, 760 (4) (725 SE2d 280) (2012) ("In determining whether a felony is inherently dangerous to human life, this Court does not consider the elements of the felony in the abstract, but instead considers the circumstances under which the felony was committed." (citation and punctuation omitted)). And where we have concluded that a predicate felony drug transaction is inherently dangerous, it has been in the context of deaths that occurred as a result of violence *during* the transaction itself, not as a result of ingesting the drugs after the transaction was completed. See id. at 760-761 (4) and cases cited therein.

Ga. 798, 801 (4) (514 SE2d 1) (1999), the predicate felony still "must be at least concurrent with the homicide in part, and be a part of it in an actual or material sense," *Eubanks*, 317 Ga. at 572 (2) (a) (iii) (citation and punctuation omitted). Here, there can be no question that the predicate felonies of sale and distribution of heroin and fentanyl, as they were charged in the indictment, were complete when Lewis delivered the drugs to the victims. See *Trammell v. State*, 262 Ga. App. 786, 786 (1) (586 SE2d 693) (2003) ("A sale of drugs is complete when the seller delivers the drugs to the . . . buyer." (citation and punctuation omitted)). From the limited appellate record, it appears that a not-insignificant amount of time (hours) and distance (from DeKalb County to Gwinnett County) separated the predicate felonies and the victims' subsequent deaths. And other than facilitating the victims' access to the drugs that later killed them, it is not at all clear how Lewis or the underlying drug sale itself, while certainly illegal, played any direct or causational role in the victims' deaths. Compare *Smith v. State*, 307 Ga. 106, 113 (4) (834 SE2d 750) (2019) (death was not

35

caused "in the commission of" aggravated assault where appellant assaulted the victim inside a nightclub, several minutes elapsed before the victim left the club, and then appellant's associates shot the victim outside), with *Bradley v. State*, 272 Ga. 740, 743 (2) (533 SE2d 727) (2000) ("Although the kidnapping was complete in Greene County, the conviction for felony murder in Morgan County nevertheless stands because the victim was under the continuous control of the defendant until she was killed; thus, the murder was within the res gestae of the kidnapping."); see also *Eubanks*, 317 Ga. at 572 (2) (a) (iii) (The cause of death is "within the res gestae" of the predicate felony where the predicate felony was "at least concurrent with the homicide in part, and [was] a part of it in an actual or material sense."). Of course, following a full presentation of the evidence against Lewis, it may be crystal clear that the victims' deaths occurred "in the commission of" the sale and distribution of heroin and fentanyl. But on the limited record before us, color me skeptical.

To be sure, I am sympathetic to the State's efforts to combat

36

the sale and distribution of ever-more potent and deadly drugs within our state. But it seems to me that the felony murder statute, as codified and understood in our decisional law, is not particularly suited to that task and, further, that obtaining a valid conviction under this theory likely cannot be done without straining at the outer limits of that decisional law — the classic square-peg-round-hole predicament, if you will. It may be that, under the current state of our law, the felony murder statute, however ill-fitted to the task, is the best tool at the State's disposal in cases like the one at hand, and this Court can do nothing to remedy that situation (though, of course, the State retains power to draft its indictment mindful of this issue). Crafting a more refined tool, one better equipped than the felony murder statute for imposing criminal liability for drug deaths, is a task for the General Assembly — a task that I would encourage that body to explore.

Turning to the challenges this case presents for purposes of determining venue, I observe a similar need for legislative attention. Of course, to consider the venue question presented here, the Court

37

considers where the cause of death was inflicted. The "inflicted" standard rests inside the constitutional requirement that a crime be prosecuted in the county where it was "committed." Paired, these requirements suggest that murder offenses are committed and, thus, that venue is proper where the cause of death was inflicted. Most of the time, that is not a difficult question. But where, as here, the State advances a theory that a given death was the end result of a chain of events occurring in multiple counties, courts are forced to wrestle with the task of providing clarity and certainty about the true state of the law while also resolving the precise disputes before them. As with the policy question above regarding the scope of the felony murder statute, providing clarity for determining where a given crime was committed is best left to the General Assembly. And to the extent the State wishes to continue prosecuting cases based on theories like the one advanced here, the bench and bar could use some help from our legislature in ascertaining the proper venue for those cases.

I am authorized to state that Presiding Justice Warren and

Justice Colvin join in this concurrence.